**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No.  08-cv-02299-REB-MJW

EVELYN GORDON, individually, and as
PERSONAL REPRESENTATIVE OF THE ESTATE OF CARRIE Q. GRIFFIN, deceased,

    Plaintiff,

v.

SUNRISE SENIOR LIVING SERVICES, INC., d/b/a SUNRISE SENIOR LIVING AT CHERRY CREEK, a Delaware corporation, and
DOES 1-5,

    Defendants.

## ORDER RE: DEFENDANT'S RULE 702 MOTION

**Blackburn, J.**

The matter before me is **Defendant's Motion Pursuant to Fed.R.Evid. 702 To Exclude Anne Ellett, N.P., M.S.N.s Opinion in Rebuttal to Opinion of Fred M. Feinsod, M.D., M.P.H., D.Sc., C.M.D.** [#46] filed August 21, 2009.  I grant the motion in part and deny it in part.

### I.  JURISDICTION

I have jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

### II.  STANDARD OF REVIEW

Defendant seeks to limit the proposed rebuttal testimony of plaintiff's expert witness.  Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**FED.R.EVID.** 702.  As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will assist the trier in determining a fact in issue. ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993); ***Truck Insurance Exchange v. MagneTek, Inc.***, 360 F.3d 1206, 1210 (10th Cir. 2004).   The Supreme Court has described the court's role in weighing expert opinions against these standards as that of a "gatekeeper."  ***See Kumho Tire Company, Ltd. v. Carmichael***, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 142 L.Ed.2d 248 (1999).

Under ***Daubert*** and its progeny, an expert opinion is reliable if it is based on scientific knowledge.  "The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."  ***Daubert***, 113 S.Ct. at 2795.  In short, the touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid."  ***Id***. at 2796; ***see also Truck Insurance Exchange***, 360 F.3d at 1210.  The party proffering the expert opinion must demonstrate both that the expert has employed a method that is scientifically sound and that the opinion is "based

on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation." ***Goebel v. Denver and Rio Grande Western Railroad Co.***, 346 F.3d 987, 991 (10th Cir. 2003) (quoting ***Gomex v. Martin Marietta Corp.***, 50 F.3d 1511, 1519 (10th Cir. 1995)).

Rule 702 demands also that the expert's opinion be relevant, that is, that the testimony "fit" the facts of the case. ***Daubert***, 113 S.Ct. at 2796; ***In re Breast Implant Litigation***, 11 F.Supp.2d 1217, 1223 (D. Colo. 1998). "'[T]he standard for fit is higher than bare relevance.'" ***In re Breast Implant Litigation***, 11 F.Supp.2d at 1223 (quoting ***In re Paoli Railroad Yard PCB Litigation***, 35 F.3d 717, 745 (3rd Cir. 1994), ***cert. denied***, 115 S.Ct. 1253 (1995)). The proffered evidence must speak clearly and directly to an issue in dispute in the case. ***Id.***

Guided by these principles, the court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible. ***Truck Insurance Exchange***, 360 F.3d at 1210; ***Smith v. Ingersoll-Rand Co.***, 214 F.3d 1235, 1243 (10th Cir. 2000). The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ***Goebel***, 346 F.3d at 992 (quoting ***Kumho Tire Company***, 119 S.Ct. at 1176).

### III.  ANALYSIS

On November 9, 2007, Carrie Q. Griffin, a resident of Sunrise Senior Living at Cherry Creek in Denver, Colorado, fell from a third-story window at the facility. She sustained multiple, severe injuries, and was transported to Denver Health Medical

Center ("Denver Health") for treatment. While hospitalized, she suffered complications and her condition declined. She died on November 27, 2007.

Plaintiff, individually as Ms. Griffin's surviving daughter and as the personal representative of her estate, has sued defendant Sunrise Senior Living Management, which operates Sunrise Senior Living at Cherry Creek, for negligence, negligent supervision, negligent misrepresentation, breach of contract, and premises liability. In support of its defense, defendant has endorsed the opinions of Dr. Fred Feinsod, a doctor of internal medicine with a qualification in geriatrics. At issue here are two of Dr. Feinsod's primary conclusions: (1) that Ms. Griffin would have survived the injuries she sustained in the fall had Denver Health not treated her with heparin during her hospitalization; and (2) that Ms. Griffin's vegan diet exacerbated her dementia and increased her risk for unpredictable behavior. Plaintiff seeks to rebut these conclusions through the expert testimony of Anne Ellett, a certified nurse practitioner and gerontological nurse consultant. Defendant maintains that a nurse practitioner such as Ellett is not qualified to offer rebuttal to the conclusions of a medical doctor such as Feinsod.

### A. Administration of heparin

Dr. Feinsod opines that Ms. Griffin would have survived the injuries occasioned by her fall had doctors at Denver Health not placed her on a continuous intravenous heparin infusion in the ten days prior to her death. Dr. Feinsod indicates that although administration of heparin, an anti-coagulant, generally is appropriate to prevent

potentially fatal pulmonary emboli following orthopedic surgery,[1] its use is absolutely contraindicated in a patient such as Ms. Griffin, with an active intracranial bleed. According to Dr. Feinsod, it was the administration of this drug that was the proximate cause of Ms. Griffin's death:

> The cause of death was respiratory and cardiac arrest due to the herniation of brain tissue that occurred as a result of the expanding right frontal subdural hematoma. Heparin treatment caused the bleeding and expansion of the subdural hematoma.
>
> . . . .
>
> Although the Certificate of Death stated that the primary cause of Ms. Griffin's demise was "multiple blunt force injuries," Ms. Griffin would have survived through 11/27/07 if she had not been treated with heparin. The blunt force caused multiple fractures and bilateral subdural hygromas.[2] But the actual expanding subdural hematoma and brain herniation would not have occurred on 11/27/07 without heparin treatment.

(Def. Motion App., Exh. A at 9-10.) Ellett attempts to rebut Dr. Feinsod's conclusions in this regard by offering the following opinion:

> It is my opinion, having worked extensively among the elderly population, that the administration of heparin following a fracture is a common practice, undertaken to anticoagulate and prevent the serious risk of pulmonary embolism. Clearly, the physicians at Denver Health Medical Center were weighing competing concerns as they determined an appropriate course of treatment for Mrs. Griffin's multiple, serious and life-threatening injuries. Those

---

[1] Ms. Griffin had four orthopedic surgeries during her stay at Denver Health to address multiple fractures of her leg, arm, and pelvis.

[2] "A hygroma is an excessive collection of cerebrospinal fluid (CSF) in the subdural space. These collections can contain both blood and CSF. Hygromas may be misinterpreted as subdural hematoma and visa [sic] versa. Acute hygromas are not uncommon after head trauma and can be a neurosurgical emergency requiring decompression." (Def. Motion. App., Exh. A at 7.)

>physicians are qualified to address the propriety of administering heparin to Mrs. Griffin and the logic of doing so, in light of their diagnostic and treatment considerations given Mrs. Griffin's numerous injuries.  In light of those extensive injuries, I am certain her physicians at Denver Health Medical Center were placed in the unfortunate position of prioritizing all of the risks associated with treating her injuries.  Nevertheless, the injuries they were treating were caused by her fall.

(*Id.*, Exh. B at 7.)

Defendant maintains that Ellett does not have the training or qualifications necessary to offer an opinion on Dr. Feinsod's medical diagnosis as to Ms. Griffin's cause of death.  Numerous opinions from both federal and state courts, including courts both in this district and in California, where Ellett is licensed to practice, support the conclusion that registered nurses and nurse practitioners are not competent to testify regarding medical causation in a medical malpractice case.[3]  **See, e.g.**, **Harvey v. United States**, 2006 WL 1980623 at *5 -6  (D. Colo. July 13, 2006); **Fein v. Permanente Medical Group**, 695 P.2d 665, 673-674 (Cal.), **appeal dismissed**, 106 S.Ct. 214 (1985). **See also Wright ex rel. Williams v. Mariner Health Care, Inc.**, 2008 WL 2704034 at *2 (S.D. Miss. July 3, 2008); **Elswick v. Nichols**, 144 F.Supp.2d 758, 767 (E.D. Ky. 2001), **aff'd**, 50 Fed.Appx. 193 (6th Cir. 2002); **Vaughn v. Mississippi Baptist Medical Center**, – So.3d –, 2009 WL 3465714 at *5 (Miss. Oct. 29, ,2009); **Phillips v. Alamed Co.**, 588 So.2d 463, 465 (Ala.1991); **People v. R.R.**, 807 N.Y.S.2d 516, 538 (N.Y. Sup. Ct. 2005); **Richberger v. West Clinic, P.C.**, 152 S.W.3d 505, 511 (Tenn. App. 2004); **Costello v. Christus Santa Rosa Health Care Corp.**, 141 S.W.3d

---

[3] Although plaintiff's claims do not involve medical malpractice, defendant's contributory negligence defense clearly implicates such issues.

245, 248-49 (Tex. App. – San Antonio 2004, no writ); **Colwell v. Holy Family Hospital**, 15 P.3d 210, 213-14 (Wash. App.), *review denied*, 32 P.3d 283 (Wash. 2001); **Long v. Methodist Hospital of Indiana, Inc.**, 699 N.E.2d 1164, 1169 (Ind. App. 1998); **Kent v. Pioneer Valley Hospital**, 930 P.2d 904, 907 (Utah App.), *cert. denied*, 939 P.2d 683 (Utah 1997).  In addition, both the California and Colorado statutes governing the practice of nursing make a distinction between the "practice of medicine," on the one hand, *see* CAL. BUS. & PROF. CODE § 2726; §12-36-106(1), C.R.S., and the "practice of nursing," on the other, *see* CAL. BUS. & PROF. CODE § 2725; §12-38-103(10), C.R.S. Colorado, in fact, specifically contemplates and differentiates the concept of a "nursing diagnosis."  *See* §12-38-103(5), C.R.S. (defining "diagnosing" under the Nurse Practices Act to "mean[] the use of professional nursing knowledge and skills in the identification of, and discrimination between, physical and psychological signs or symptoms to arrive at a conclusion that a condition exists for which nursing care is indicated or for which referral to appropriate medical or community resources is required.")

From these precedents and statutes, it appears clear that a nurse is not qualified to offer a medical diagnosis or opine as to medical causation in a malpractice case.[4] Indeed, plaintiff herself does not directly contest the assertion that Ellett is not qualified to offer opinions as to such matters.  Instead, plaintiff counters that Ellett's opinions are offered for different purposes.  I find none of these rationales persuasive.

Plaintiff argues first that Ellett's opinion merely "dispel[s] the mistaken belief that

---

[4] Defendant's intervening cause defense clearly implicates issues of medical negligence and malpractice.

the administering of heparin is in any way out of the ordinary in treating the elderly who suffer fractures as a result of a serious fall." (Plf. Resp. Br. at 6.)  As set forth above, the first sentence of Ellett's opinion avers that the administration of heparin to prevent pulmonary embolism in an orthopedic patient is "common practice."  Such an opinion adds nothing to the evidence already before the jury.  Feinsod's report thoroughly explains the indications for the use heparin in cases such as those confronting doctors at Denver Health in Ms. Griffin's case.  To that extent, therefore, Ellett's opinion is not helpful or relevant because it is merely redundant.

Second, plaintiff argues that Ellett's opinion provides context regarding the situation facing Ms. Griffin's care providers.  More specifically, it is claimed that her testimony will allow the jury to see that Ms. Griffin's doctors were forced to prioritize the potential risks and make difficult choices as to how to manage conflicting concerns occasioned by her various injuries.  Were Ellett's opinion confined to describing the concept of medical triage to the jury, I would find it less problematic.[5]  However, the infirmity of Ellett's opinion in this regard lies not so much in her professional qualifications *vel non*, but in the largely speculative nature of her statements.  As set forth in her expert report, it appears that Ellett professes to know what was in the mind of the physicians at Denver Health when they chose to administer heparin to Ms. Griffin. Of course, such prescience on her part is not possible, much less permissible testimony, whether lay or expert.  This much of Ellett's opinion seems better suited to cross-examination of Feinsod.

---

[5] In so saying, I do not find or imply that I have found Ellett qualified to offer such an opinion.

Finally, plaintiff claims Ellett's opinion is necessary to show that "what happened in the emergency room is irrelevant because Ms. Griffin would not have suffered multiple fractures and internal bleeding had she not fallen out of the third story of a building." (Plf. Resp. at 6.)  To the extent this testimony can be characterized as a medical diagnosis, it clearly is beyond Ellett's qualifications and flunks under the precedents and statutory authority noted above.  More to the point, however, the fact that Ms. Griffin suffered injuries as a result of her fall is neither contested nor obscure. It is, in effect, the type of obvious fact that does not require expert testimony to confirm. ***See Lovato v. Burlington Northern and Santa Fe Railway Co.***, 2002 WL 1424599 at *12 (D. Colo. June 24, 2002) ("[T]o assist the trier of fact, an expert must testify to something more than what is obvious to the layperson") (quoting ***Ancho v. Pentek Corp.***, 157 F.3d 512, 519 (7th Cir. 1998) (internal quotation marks omitted)).

For these reasons, I find that Ellett's rebuttal opinions regarding the administration of heparin to Ms. Griffin are inadmissible.  Defendant's motion will be granted insofar as it challenges those opinions.

### B. Effect of vegan diet on cognition and mental functioning

Dr. Feinsod opines also that Ms. Griffin was protein-calorie malnourished at the time of her fall, which malnutrition he attributes to her vegan diet.  He states that it is difficult for an elderly person to consume the one gram of protein per kilogram of bodyweight per day necessary to maintain an anabolic state on a diet that does not include traditional, animal-based sources of protein.  Records from November 14, 2007,

show that Ms. Griffin's serum albumin was 1.4,[6] which according to Dr. Feinsod "demonstrate[] that Ms. Griffin did not take in adequate protein for a prolonged period of time, probably years." (Def. Motion App., Exh. A at 13.)  More to the point,

> Serum albumins that are less than 2 are closely associated with physiological decline, increased infection, and early mortality. . . .
>
> [Protein-calorie malnutrition] negatively influences quality of life for elderly residents in nursing homes.  Malnutrition can reduce cognition and increase the risk for delirium four fold.
>
> Thus, Ms. Griffin's Vegan diet played a role in her cognitive decline.  This severely protein-depleted individual was at risk for mood disturbances, more rapid cognitive decline, and intermittent delirium.

(*Id.* (internal citations omitted).)  In rebuttal, Ellett states her opinion "that among the elderly population, these low levels are very common, including those individuals not on a vegan diet."  (*Id.*, Exh. B at 7.)

There is nothing objectionable in Ellett's opinion in this regard.  An observation that low serum albumin levels are routinely found in elderly patients regardless of their dietary choices is not a medical diagnosis, nor does it make any direct statement as to medical causation.  In this case, I agree with plaintiff that Ellett's statement merely provides a broader context for Feinsod's opinion on the issue.  Assuming that Ellett's familiarity with the serum albumin levels of a sufficiently broad base of the elderly population can be established at trial, she is not disqualified from so testifying. *See* Fed.R.Evid. 701(1).

---

[6] The report does not give a standard of measurement by quantify this number (e.g., "milliliter per liter of blood").

**THEREFORE, IT IS ORDERED** as follows:

1. That **Defendant's Motion Pursuant to Fed.R.Evid. 702 To Exclude Anne Ellett, N.P., M.S.N.s Opinion in Rebuttal to Opinion of Fred M. Feinsod, M.D., M.P.H., D.Sc., C.M.D.** [#46] filed August 21, 2009, is **GRANTED IN PART** and **DENIED IN PART**:

   a. That the motion is **GRANTED** insofar as it seeks to exclude the opinions of Anne Ellett, N.P., M.S.N., as to the administration of heparin to Carrie Q. Griffin by physicians at Denver Medical Health Center, as discussed more fully herein; and

   b. That the motion is **DENIED** otherwise.

Dated November 5, 2009, at Denver, Colorado.

          **BY THE COURT:**

          */s/ Bob Blackburn*
          Robert E. Blackburn
          United States District Judge